# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 05-36
## consolidated with 05-104

STATE OF LOUISIANA

VERSUS

DUSTIN K. RUNYON

************

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF CATAHOULA, NOS. 03-736 and 03-817,
HONORABLE LEO BOOTHE, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**

John F. Johnson
District Attorney
Bradley R. Burget
Assistant District Attorney
4001 Carter Street, Suite 9
Vidalia, Louisiana  71373
(318) 336-5526
Counsel for:
    State of Louisiana

G. Paul Marx
Louisiana Appellate Project
Post Office Box 82389
Lafayette, Louisiana  70598-2389
(337) 237-2537
Counsel for Defendant/Appellant:
    Dustin K. Runyon

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana  70602-1641**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
     **Joel R. McDonald**

SULLIVAN, Judge.

Dustin Runyon and Joel McDonald were separately charged with the second degree murder of Daniel Wiley and the attempted second degree murder of his step-brother, Willis Dulworth. The two cases were consolidated and tried before a jury. Defendant Runyon was convicted of manslaughter and attempted second degree murder, and Defendant McDonald was convicted of second degree murder and attempted second degree murder. Both Defendants filed motions for new trial which were denied by the trial court.

Defendant Runyon was sentenced to serve forty years at hard labor for manslaughter and forty years at hard labor for attempted second degree murder with ten years of said sentence being without benefit of parole, probation, or suspension of sentence. The trial court ordered the two sentences to run concurrently.

Defendant McDonald was sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for his conviction of second degree murder. For his attempted second degree murder conviction, he was sentenced to forty years at hard labor with ten years of the sentence to be served without benefit of parole, probation, or suspension of sentence, to run consecutive to his life sentence.[1] Defendants' motions to reconsider sentence were denied by the trial court. They appeal, seeking review of their convictions and sentences.

Defendant Runyon challenges the sufficiency of the evidence presented against him and claims that his joint trial with Defendant McDonald violated his right to due process because he was unable to cross-examine Defendant McDonald regarding the content of his statement to police. He also contends his sentences are excessive.

---

[1]The trial court stated that Defendant Runyon's sentence for attempted second degree murder and both of Defendant McDonald's sentences were to be served in the Department of Corrections, which is necessarily at hard labor. La.R.S. 15:824(C).

Defendant McDonald also challenges the sufficiency of the evidence presented against him. He claims he acted in self-defense. If this court concludes that the State proved he did not act in self-defense, he contends that his convictions should be reduced to manslaughter and attempted manslaughter. He further claims that his request for a change of venue should have been granted and that his sentences are excessive.

### *Facts*

On the night of March 8, 2003, Defendant Runyon, his sister, Jamie Bailey, her boyfriend, Defendant McDonald, and friends William Meredith and Keith Warren went fishing at Larto Lake in Catahoula Parish. After they were there for about three and one-half to four hours, the victims, Mr. Dulworth and Mr. Wiley, and their friend, Amy Denny, arrived. An altercation occurred between the two parties, which resulted in Mr. Wiley's death and Mr. Dulworth being seriously injured.

Defendants Runyon and McDonald, Mr. Warren, Mr. Meredith, and Ms. Bailey presented themselves to the Catahoula Sheriff's Department the evening of March 10, 2003, after learning Mr. Wiley died as a result of injuries inflicted during the altercation. They all made statements to the police. Defendant Runyon's and Defendant McDonald's audio statements were played for the jury during the trial. Mr. Dulworth, Ms. Denny, and Defendant Runyon testified at trial about the events that transpired that night upon their arrival at Larto Lake.

Mr. Dulworth testified that, earlier in the day, he, Ms. Denny, her brother Barrett, and Mr. Wiley went to a camp at Larto Lake. In the evening, they left the camp and went to Noble's Bar. Mr. Dulworth testified that he consumed alcohol at the camp, but not at the bar because he was only eighteen years old at the time. He

2

also testified that Mr. Wiley consumed alcohol at the camp and at the bar and was intoxicated. The group of four left the bar around 9:00 p.m. Barrett Denny was dropped off at home. The other three, who were in Ms. Denny's car, picked up Mr. Wiley's truck, a jacked-up 4x4 Chevy Blazer, to go mud riding. Mr. Wiley drove to the dam near the bridge "where all the kids go." Mr. Dulworth testified that upon their arrival, they saw a couple of vehicles down by a fire. Thinking it might be someone they knew, Mr. Wiley drove down the hill and turned around in the water. Mr. Dulworth testified that Mr. Wiley "cut a little donut" in the water; Ms. Denny testified that Mr. Wiley spun his tires. Ms. Bailey and Defendant McDonald were fishing nearby. Mr. Wiley pulled up to the couple and asked if they were catching any fish; he was not belligerent, mean, or condescending. While Mr. Wiley was talking to the couple, Defendant Runyon, Mr. Meredith, and Mr. Warren, who were fishing on the other side of the lake, came over to where Mr. Wiley had stopped.

According to Mr. Dulworth, one of these three men was worried that Mr. Wiley might have run over Ms. Bailey and/or Defendant McDonald, and "a little argument" arose. Mr. Dulworth testified that he did not recall Mr. Wiley's response to the bickering because he was not paying close attention to what was going on, but he testified he would have noticed if Mr. Wiley had gotten loud. Mr. Dulworth testified that one of the three guys told them to go to the other side of the road and that he understood the comment to mean they wanted to fight.

Ms. Denny testified she was sitting between Mr. Wiley and Mr. Dulworth and Mr. Wiley did not get mad, scream, or curse at the guys. One of the three guys repeatedly told Mr. Wiley that he almost ran over Ms. Bailey and Defendant McDonald. According to Ms. Denny, Mr. Wiley was apologetic and said he did not

3

mean to scare the couple. She identified Defendant Runyon as the most vocal of the group and testified that he told them they could handle things across the bridge. According to Ms. Denny, Mr. Wiley agreed to go to the other side of the bridge, but "he kind of laughed . . . like it was a joke." Mr. Wiley drove down the road, turned around, drove back, then pulled his truck off on the other side of the road.

Mr. Dulworth testified that, as they were sitting there, the others told them to come back. Ms. Denny testified that, when they got to the location where they were told to go, no one was there, so they went back up to the bridge and stopped near the back of Defendants' trucks. Mr. Wiley pulled his truck in front of their trucks and got out; Mr. Dulworth followed. Mr. Wiley and Mr. Dulworth then walked over to the Defendants and their friends. Mr. Wiley and the others argued back and forth, but according to Mr. Dulworth, Mr. Wiley was not being loud or obnoxious. Mr. Dulworth returned to the cab of the truck to get a cigarette from Ms. Denny. When Mr. Dulworth walked back to the others, Mr. Wiley was walking toward his truck saying, "We're leaving." As Mr. Dulworth started climbing back in the truck, he heard one of the guys tell Mr. Wiley to "suck my dick." Mr. Wiley then climbed back out of the truck and followed the guys down the hill. As Mr. Wiley was walking down the hill, Mr. Dulworth heard him say "I have permission to whip your ass" in response to the comment.

Ms. Denny testified that the conversation got louder when she and Mr. Dulworth went to the truck to get a cigarette. As she was climbing back in the truck, Mr. Dulworth told her to call her cousin Casey. According to Ms. Denny, Mr. Dulworth said this because "there was five of them - - and Daniel and Willis."

4

Mr. Dulworth and Ms. Denny testified that they did not hear anyone ask Mr. Wiley to leave them alone or that they be allowed to leave.

According to Mr. Dulworth, Mr. Wiley had no gun, knife, pipe, or object of any kind with him. He saw Mr. Wiley and Mr. Warren, the guy who made the "suck" comment, fighting down by the water. Mr. Dulworth saw Mr. Wiley push Mr. Warren, but he does not know who made the initial contact. According to Mr. Dulworth, Defendant Runyon ran toward Mr. Wiley, picked up what appeared to be a log, and hit Mr. Wiley "across the back, or head." Mr. Dulworth then tackled Defendant Runyon; they fell into the fire and rolled off of it. Mr. Dulworth testified he stayed on top of Defendant Runyon, fighting him, to keep him on the ground. He does not remember if he hit Defendant Runyon. He also testified that he had no knife or weapon in his hand and that he never reached for anything while he fought with Defendant Runyon.

While on top of Defendant Runyon, Mr. Dulworth felt something repeatedly hitting him in the back and began to feel weak. He got off Defendant Runyon. While he was lying on the ground, Mr. Meredith, who had his hand out, came up and told him to stay on the ground or he would get cut. Mr. Dulworth testified that he saw something in Mr. Meredith's hand, although he said it could have been his finger. Later, he testified that he did not know if Mr. Meredith had anything in his hand. In his statement to police, Mr. Dulworth said he saw a knife in Mr. Meredith's hand.

Mr. Dulworth testified he then saw Mr. Warren running out of the water from near Mr. Wiley. Defendants Runyon and McDonald and their friends ran to their trucks and left. As they were leaving, Mr. Dulworth heard Mr. Wiley hit the water.

5

He made his way over to him but could not do anything for him because he himself was "passing in and out." Mr. Dulworth testified he told Ms. Denny to call for help.

Mr. Dulworth does not know who stabbed him or Mr. Wiley. At trial, he confirmed that, in his statements to police, he suggested that the guy he was wrestling, Defendant Runyon, was not the one who stabbed Mr. Wiley because he had tackled him. A knife found on the scene was shown to Mr. Dulworth at trial, but he did not recognize it. The knife was sent to a laboratory for testing; it was not analyzed before trial due to the facility's backlog.

Mr. Dulworth knew his step-brother for about four years before his death. He testified that he did not know him to be quick to react or to fight when drunk. According to Mr. Dulworth, Mr. Wiley was funny and laughing when drunk. Ms. Denny, who grew up with Mr. Wiley, described him as sweet, lovable, like a "big teddy bear." She, too, had never known him to get in fights or cause trouble, and she testified that his behavior did not change when he drank. Other witnesses also testified that Mr. Wiley was a gentle giant and not a fighter or a bully. However, none of these witnesses testified that they had been around him when he was intoxicated.

Dr. Karen Ross, an assistant coroner and forensic pathologist with the Jefferson Parish Coroner's Office, performed an autopsy on Mr. Wiley. According to Dr. Ross, Mr. Wiley was 6'1" and weighed 312 pounds. The cause of his death was blood loss which resulted from seven sharp force injuries inflicted on him. He had one wound on the back of his left upper arm, which was three and one-quarter inches long and five inches deep. Another wound on the back of his arm was three-quarter by one-half inch long and one and three-quarter inches deep. A cut on his back was two and

6

three-quarter inches long and one and three-quarter inches deep. A stab wound on his face and chin was one inch long; it went through his lip, the periosteum (the soft tissue lining the jaw), the floor of the mouth, then entered his "upper chest, lower neck region." Dr. Ross testified that significant force was required to penetrate through the periosteum of the jaw. Mr. Wiley had a wound on his right upper neck, which was five inches deep that went through the muscles of the right side of his neck and transected some of the smaller branches of the subclavian artery and the left subclavian artery and vein. According to Dr. Ross, this wound also took a lot of force to inflict.

Mr. Wiley also had a cut on his head, which Dr. Ross testified differs from a stab wound in that it is longer than it is deep. When asked whether she could determine what caused this cut, Dr. Ross testified it was "a single edged instrument such as a knife." However, she acknowledged during questioning by the State that it was "possible" that this wound could have been caused by the "sharp edge" of a log.

Dr. Clinton McGehee, the surgeon who cared for Mr. Dulworth, testified Mr. Dulworth had four stab wounds to his back, three to the left of his midline and one to the right. The three wounds on his left side were on his upper torso, in the area just above his belt, and close to the spine. The wound on the right side was four inches or more on the right side of the spine.

As a result of his injuries, Mr. Dulworth's left lung collapsed and blood collected in the left side of his chest. He also had a penetrating injury to his spleen which was one of the deepest wounds Dr. McGehee has ever seen. Because the skin on the back is fairly thick and Mr. Dulworth is a big, muscular guy, Dr. McGehee felt

7

this particular wound required a great deal of force to inflict. The other wounds on the left side of his back were smaller and not large enough for Dr. McGehee to determine the depth. Although Dr. McGehee acknowledged it was possible that one stab wound caused both of these smaller injuries, he felt they were more likely caused by different wounds. He testified there was no way to make a definitive determination. The wound on the right side of Mr. Dulworth's back did not result in any intra thoracic injuries or intra abdominal injuries; therefore, Dr. McGehee felt that wound did not penetrate all the way into the chest cavity. Both the injury that caused the collapsed lung and the one that pierced Mr. Dulworth's spleen were potentially fatal.

Dr. McGehee was asked hypothetically if Mr. Dulworth had someone pinned face down on the ground and that person had a knife in their right hand, whether the person could reach around and inflict the wound on Mr. Dulworth's right side. Dr. McGehee did not think the person could inflict the wounds on either side because Mr. Dulworth is a "big guy," and he did not think the person's arm could go that far back. In a demonstration with counsel, Dr. McGehee indicated that it might be possible if the person was "really cooperative."

### Errors Patent

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. Review of this record revealed there is one error patent. The penalty provision for attempted second degree murder requires the entire sentence be served without benefit of parole, probation, or suspension of sentence; however, the trial court ordered only ten years of Defendants' sentences to

8

be served without benefits, La.R.S. 14:27 and 14:30.1. Thus, Defendants received illegally lenient sentences for their attempted second degree murder convictions.

For the reasons set forth hereinafter, we conclude that Defendant Runyon's conviction for attempted second degree murder should be reduced to aggravated battery and re-sentencing ordered. Therefore, no action concerning this error patent is warranted with respect to him, and our discussion addresses Defendant McDonald's sentences only.

The trial court imposed a forty-year term of imprisonment on Defendant McDonald for his attempted second degree murder conviction, ten years less than the maximum. Had the trial court realized that the entire term of imprisonment must be served without benefits, it may have imposed a lesser term of imprisonment. For this reason, we vacate the sentence imposed and remand this matter to the trial court for re-sentencing. The trial court is instructed that the entirety of any sentence imposed must be served without benefit of parole, probation, or suspension of sentence.

### *Defendant Runyon*

### *Sufficiency of the Evidence*

Defendant Runyon challenges the sufficiency of the evidence presented against him. A finding that the evidence was insufficient to convict him would result in an acquittal; therefore, this assignment of error is addressed first. *State v. Hearold*, 603 So.2d 731 (La.1992).

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*,

393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

### *Manslaughter*

Defendant Runyon was convicted of the manslaughter of Mr. Wiley, which is a responsive verdict of second degree murder. La.Code Crim.P. art. 814(3).

Manslaughter is defined in part as:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La.R.S. 14:31(A). Second degree murder is "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1(A)(1).

Defendant Runyon testified at trial that Mr. Wiley's behavior was much more aggressive than indicated by the State's witnesses. He indicated that, after Mr. Wiley drove by Ms. Bailey and Defendant McDonald, he went over and asked Mr. Wiley, "You know, you know, why you doing this for? What's the problem." He claims Mr. Wiley responded something like, "I can do whatever I want. This is Larto land."[2] According to Defendant Runyon, Mr. Warren and Mr. Wiley had a problem with each

---

[2]Ms. Denny testified that she did not hear Wiley say this.

other, and he asked Mr. Wiley, "Why can't y'all just take it to the other side?" However, the men continued to have words. Defendant Runyon said he tried to tell Mr. Warren to shut up. Mr. Wiley told them he was going to come back and whip "everybody's ass." Then he and his friends left, returned a minute later, and parked in front of Mr. Warren's truck. Mr. Wiley opened his truck door and fell out, along with two or three beer bottles. Defendant Runyon testified he tried to reason with Mr. Wiley for ten to twelve minutes, asking him to leave Mr. Warren alone and telling him they did not want any trouble. Defendant Runyon said he told Mr. Wiley they wanted to load up their stuff and go home.

However, Mr. Wiley and Mr. Warren "got into it some more," and Mr. Wiley asked Mr. Warren, "Do I have permission to whip your ass?" Mr. Warren responded, "You have permission to suck my dick." Mr. Wiley then started walking down the hill toward Mr. Warren; Mr. Dulworth followed, walking beside him. Defendant Runyon followed the men. He testified he saw Mr. Dulworth pull a pocket knife out of his back pocket and act like he was going to open it. Defendant Runyon told him to put the knife up, and he complied.

Defendant Runyon next testified he hit Mr. Wiley on his back or his head with the log because he was huge, and he was "whipping up" on Mr. Warren and he believed Mr. Warren's life was in danger due to Mr. Wiley's size. He testified he hit Mr. Wiley between the shoulder blades and did not aim for his head, but acknowledged the log could have hit his head. When asked why he used the log on Mr. Wiley who was twenty-five feet away from him instead of on Mr. Dulworth, who was right beside him, Defendant Runyon testified, "I made a mistake." He further

11

testified he did not intend to kill Mr. Wiley; he just wanted to "get him off my friend [and make him] [l]eave us alone." He admitted he did not see Mr. Wiley with a knife.

Defendant Runyon told the police he had opened his knife when Mr. Wiley returned and fell out of his truck because he anticipated problems in light of Mr. Wiley's statement that he was "going to whip some asses." When asked if he anticipated cutting someone, Defendant Runyon responded he was going to protect himself and his sister and did not know if "them men had guns or what."

Dr. Angela Springfield, an expert in the field of forensic toxicology, testified for the defense. She reviewed the victims' medical records and noted Mr. Wiley's blood alcohol level was .21 grams percent and his vitreous level was .23 grams percent. According to Dr. Springfield, the first thing a person loses when he is intoxicated is his judgment, and he may take risks that he normally would not. With the ingestion of more alcohol, the ability to make good decisions is increasingly impaired, as is motor control. Dr. Springfield also felt that aggressive behavior may be exhibited by someone with Mr. Wiley's blood alcohol level.

Defendant Runyon contends there was no evidence that he intended to kill Mr. Wiley. He contends the verdict is contrary to the evidence, which shows Defendant McDonald stabbed both victims and killed Mr. Wiley "in the heat of the moment such that [he] cannot have been held to knowledge [of] or aiding in that offense." He further contends that his striking Mr. Wiley with the log cannot support a verdict of second degree murder because he did not intend the action taken by Defendant McDonald, that is, slitting Mr. Wiley's throat. He also argues he did not

12

have the requisite mental state to commit the crime, which is required for him to be a principal.[3]

The State's position is that a rational juror could conclude Defendant Runyon had the specific intent to kill from the fact that he struck Mr. Wiley in the back of the head with a large piece of firewood and that the injury contributed to his death.

Viewing the evidence in the light most favorable to the State, a rational trier of fact could have determined that Defendant Runyon hit Mr. Wiley on the head with a log and the hit satisfied the requirements of La.R.S. 14:31(A)(1), i.e., Defendant Runyon's hitting Mr. Wiley on the head with a log with enough force to knock him to the ground evidenced the specific intent to, at the least, inflict great bodily harm on him. It was reasonable for the jury to accept the State's argument that the two groups were engaged in what was essentially a fist fight until Defendant Runyon hit Mr. Wiley in the head with a weapon. While Mr. Wiley was a big man, he was intoxicated, and he and Mr. Dulworth were outnumbered two to one.

There was no error in the jury's manslaughter verdict.

### Attempted Second Degree Murder

In *State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437, the supreme court addressed the requisites of a conviction of attempted second degree murder, explaining:

> To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," La. R.S. 14:30.1, attempted second degree murder requires specific intent to kill. *State v. Huizar*, 414 So.2d 741 (La.1982). Specific intent may be

---

[3]Defendant Runyon does not argue that he acted in self-defense or defense of others.

13

inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); *State v. Butler*, 322 So.2d 189 (La.1975); *State v. Martin*, 92-0811 (La.App. 5 Cir. 5/31/94), 638 So.2d 411.

Defendant Runyon argues there is no rational basis for convicting him of the attempted second degree murder of Mr. Dulworth. This argument is prefaced on Mr. Dulworth's testimony that he was stabbed from behind while he was on top of Defendant Runyon and that Mr. Meredith warned him to stay down while he was on Defendant Runyon or he would be cut. He also points out that Defendant McDonald admitted stabbing Mr. Dulworth at least three times. Considering Mr. Dulworth's testimony and the admission by Defendant McDonald, he contends his conviction for attempted second degree murder of Mr. Dulworth should not be upheld.

Defendant Runyon testified that while he was being held down on the ground by Mr. Dulworth, he removed his knife from his pocket and attempted to stab Mr. Dulworth to get him off of him. In his statement to police, he initially stated he stabbed Mr. Dulworth, but then said he did not know if he did because Mr. Dulworth was on his back. Later in his statement, Defendant Runyon was asked if he was on his stomach while Mr. Dulworth was on his back; he replied, "more or less on my side. On my stomach and my side." When asked why he tried to stab Mr. Dulworth, Defendant Runyon explained that Mr. Dulworth was hitting him in the back of the head, and he knew Mr. Dulworth had a knife.

At trial, Defendant Runyon admitted that on the night of the incident, he *thought* he stabbed Mr. Dulworth. However, after considering the location of Mr. Dulworth's injuries, he testified that it was not possible for him to have reached around Mr. Dulworth and stabbed him.

14

In his statement, Defendant McDonald stated he stabbed Mr. Dulworth a "couple" of times because he saw him reaching for something and he thought he might be stabbing Mr. Warren.[4] Later in his statement, he stated he stabbed Mr. Dulworth approximately two or three times in the back or the side.

The State contends that Defendant Runyon's specific intent to kill Mr. Dulworth was evidenced by his stabbing Mr. Dulworth in the back numerous times. The State further contends the three wounds on Mr. Dulworth's right side were inflicted by Defendant Runyon's swinging of his right hand into Mr. Dulworth's back and the wound on the left side of Mr. Dulworth's back was inflicted by Defendant McDonald.

Defendant Runyon did tell the police that he stabbed Mr. Dulworth, but when he was asked where he stabbed him, he said, "I really don't recall, sir. He was on my back and I was face down . . . I really don't even know if I stabbed him or not. But I know I was trying to." Later, when asked whether it was possible he could have stabbed Mr. Dulworth in the back four times, Defendant Runyon replied, "I guess." At another point, he said he "might" have stabbed him, but he did not know because Mr. Dulworth was on his back. Defendant Runyon stated he was on his stomach and/or his side when Mr. Dulworth was on top of him.

At trial, Defendant Runyon first testified that during the fifteen to thirty seconds he was pinned face down on the ground by Mr. Dulworth, he tried to reach in his pocket and grab his knife because he was going to stab him. He explained that he exaggerated the details of stabbing of Mr. Dulworth in his statement to police and

_____

[4]Defendant McDonald's statement reveals that he believed Mr. Dulworth was on Mr. Warren. The evidence established that Mr. Dulworth was actually on Defendant Runyon, not Mr. Warren. Therefore, references regarding Defendant McDonald's statement are to Mr. Dulworth being on Defendant Runyon, not Mr. Dulworth being on Mr. Warren.

that, although he had tried, it was virtually impossible for him to have stabbed Mr. Dulworth in the manner in which he was stabbed. When asked why he tried to stab Mr. Dulworth, he said Mr. Dulworth was hitting him in the back of the head and he knew Mr. Dulworth had a knife; however, he did acknowledge that Mr. Dulworth had put his knife up earlier.

Reviewing the evidence in the light most favorable to the State, it is unlikely that Defendant Runyon inflicted any of Mr. Dulworth's wounds. Although it is undisputed that Defendant Runyon attempted to stab Mr. Dulworth and may have originally believed he stabbed Mr. Dulworth, Dr. McGehee's testimony establishes it is unlikely that he did so. Dr. McGehee testified that he did not believe Defendant Runyon could have inflicted any of Mr. Dulworth's stab wounds because of Mr. Dulworth's size and Defendant's Runyon's position under him. In his opinion, Defendant Runyon could have stabbed Mr. Dulworth only if Mr. Dulworth was "really cooperative." Under the circumstances presented here, this is extremely unlikely. Defendant Runyon was unsure of whether he actually stabbed Mr. Dulworth at the time he gave his statement to police. When Defendant Runyon's statements and Dr. McGehee's testimony are considered in conjunction with the fact that Mr. Dulworth does not know who stabbed him and Defendant McDonald's admission that he inflicted at least two or three wounds leads to the conclusion that the State did not establish beyond a reasonable doubt that Defendant Runyon stabbed Mr. Dulworth.

Although the State did not establish that Defendant Runyon stabbed Mr. Dulworth, we must consider whether he was a principal to Mr. Dulworth's injury.

16

In *State v. Mitchell*, 99-3342, pp. 5-6 (La. 10/17/00), 772 So.2d 78, 82 (emphasis added), the supreme court set forth the law of principals, stating:

> All persons can be convicted as a principal to a crime if he is "concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." LA.REV.STAT. § 14:24. Not all principals are automatically guilty of the same grade of offense as the main offender because the mental state of the offenders may be different. *State v. Brooks*, 505 So.2d 714(La.), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). **Thus, "an individual may only be convicted as a principal for those crimes which he personally has the requisite mental state."** *Id*. **The intent of the accomplice cannot be inferred to the accused**. *State v. Holmes*, 388 So.2d 722 (La.1980).

> Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LA.REV.STAT. § 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact but may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Graham*, 420 So.2d 1126 (La.1982).

Thus, the State had to prove Defendant Runyon had the specific intent to kill Mr. Dulworth to sustain his conviction of second degree murder.

In *State v. Dozier*, 553 So.2d 911 (La.App. 4 Cir. 1989), *writ denied*, 558 So.2d 568 (La.1990), Dozier and co-defendant Walton were visiting at the home of Gail Thomas, an apartment that she shared with the victim, Harvey. Harvey and Walton got into an argument over money and after Walton spit on Harvey, they started fighting in the living room. The fight continued outside, and Harvey threw Walton on the ground. Later that morning, Harvey, needing to leave, found that his vehicle was blocked by Walton's vehicle. Harvey sent Thomas' brother, George Yarbrough, to ask Walton to move his vehicle. Walton appeared with Dozier and his brother, and Walton told Harvey if he wanted the car moved, he'd have to do it himself. Harvey left, then returned and got his brother Benjamin, and the two approached Walton's

17

vehicle.  Walton was under the dashboard working on the radio.  When Harvey inquired as to whether Walton was going to move the car, Walton again told him to move it himself.  Harvey punched Walton in the face, and Dozier exited Walton's car with a gun.  He held it at Benjamin, who walked away.  Dozier then pointed the gun at Harvey and they began arguing.  While they were arguing, Walton pulled a gun from under the car seat and shot Harvey.

On appeal, the fourth circuit found that Dozier was not a principal to Walton's actions because there was little evidence which showed that Dozier had any idea that Walton was going to kill Harvey.  The court noted that Dozier may have been protecting himself from attack.  Thus, it reversed Dozier's conviction of manslaughter.

In his statement to police, Defendant Runyon stated he was aware that Defendant McDonald carried a knife, and the evidence established that Defendant Runyon and his friends were, at the least, willing participants in the fight.  However, the evidence does not establish that Defendant Runyon had any reason to anticipate that Defendant McDonald would attack Mr. Dulworth or that such an attack would be as vicious as it was.  The evidence *does* establish that Defendant Runyon's attempts to stab Mr. Dulworth were in response to his hitting him.  The evidence does not establish that Defendant Runyon "actively desired" potentially fatal injuries to be inflicted on Mr. Dulworth.  As in *Dozier*, we conclude that the State did not establish that Defendant Runyon had the specific intent to kill Mr. Dulworth.

Pursuant to La.Code Crim.P. art. 814(3), guilty of attempted manslaughter and guilty of aggravated battery are responsive verdicts for attempted second degree murder.  Attempted manslaughter also requires the specific intent to kill.  *State v.*

18

*Hutcherson*, 34,540 (La.App. 2 Cir. 4/4/01), 785 So.2d 140. Therefore, Defendant Runyon cannot be guilty of this crime either.

Aggravated battery is a battery committed with a dangerous weapon. La.R.S. 14:34. Battery includes "the intentional use of force or violence upon the person of another." La.R.S. 14:33. The State must prove the defendant intentionally used force or violence against the victim, the force was inflicted with a dangerous weapon, and the dangerous weapon was used in a manner likely to cause great bodily harm to support a conviction of aggravated battery. *State v. Wix*, 02-1493 (La.App. 4 Cir. 1/15/03), 838 So.2d 41, *writ denied*, 03-678 (La. 10/17/03), 855 So.2d 756. In the absence of qualifying provisions, the terms "intent" and "intentional" have reference to "general criminal intent." La.R.S. 14:11. Therefore, aggravated battery requires only general criminal intent. La.R.S. 14:33. *See also, State v. Etienne*, 94-910 (La.App. 3 Cir. 2/1/95), 649 So.2d 1230, *writ denied*, 95-544 (La. 6/23/95), 656 So.2d 1012. "General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed consequences as reasonably certain to result from his act or failure to act." La.R.S. 14:10(2).

There was physical contact between Defendant Runyon and Mr. Dulworth, and Defendant Runyon admittedly used force against Mr. Dulworth with a dangerous weapon, his knife, as he attempted to stab him with a knife. Accordingly, he did commit aggravated battery. *See State v. Howard*, 94-23 (La. 6/3/94), 638 So.2d 216.

Defendant Runyon's conviction for attempted second degree murder is reversed, and a judgment of guilty to the lesser included offense of aggravated battery is entered against him. This case is remanded for re-sentencing on this conviction.

*Motion to Sever*

Defendant Runyon contends that his joint trial with Defendant McDonald resulted in an unconstitutional violation of due process because he could not cross-examine Defendant McDonald's statement, which was introduced into evidence at the trial. He contends that admission of the statement was a violation of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004), and *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620 (1968), which address a defendant's right to confront the witnesses against him, that he was prejudiced thereby, and that his convictions must be reversed.

The State moved to consolidate Defendants' cases for trial over the objection of both defense attorneys; each attorney expressed concern that the co-defendant's actions would "taint" his client. The trial court ordered the two cases consolidated for trial over these objections.

Defendant Runyon's attorney subsequently filed a motion to sever, alleging Defendant McDonald was willing to testify favorably for him at a separate trial. At the hearing on the motion, counsel argued that it was possible Defendant McDonald would be called to the stand and questioned regarding his prior felony record which, in counsel's opinion, would be prejudicial to Defendant Runyon. The trial court denied the motion.

The State filed a motion in limine, seeking admission of statements given by the Defendants to police at trial. A hearing on the motion was held just prior to opening statements. At the hearing, counsel for Defendant McDonald noted that prior to the statements being admitted, the State was required to prove the statements were given freely and voluntarily, but neither he nor counsel for Defendant Runyon made

any specific objections to the introduction of the statements. After the testimony on the motion was heard, Defendant Runyon's attorney deferred to Defendant McDonald's attorney for purposes of argument; Defendant McDonald's attorney stated they had no objection to the admissibility of the statements because they felt the State proved they were freely and voluntarily given. Neither Defendant objected to the introduction of the statements at trial.

In *State v. Conway*, 556 So.2d 1323 (La.App. 3 Cir.), *writ denied*, 563 So.2d 876 (La.1990), the defendants contended that the trial court's admission of their confessions violated their right to confrontation because they did not testify at trial. This court held:

> We need not consider whether each defendant's confession was directly admissible against his co-defendant, or whether it denied each the right of cross-examination and confrontation, nor whether the admission of the confessions was harmless error because the record reflects that neither defendant objected to the admission of either confession. In fact, the record shows that both defendants' counsel replied that there was no objection to each defendants' confessions being introduced into evidence and exhibited to the jury. La.C.Cr.P. Art. 841 states in pertinent part:
>
> > "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. . . ."
>
> No objection was raised by either defendant to the admission of the confessions of either at the time of trial; therefore, in the absence of a contemporaneous objection at time of the trial the defendants may not argue the issue on appeal. They have each waived such objections. La.C.Cr.P. Art. 841; *State v. Hebert*, 443 So.2d 613 (La.App. 3 Cir.1983), writ den., 444 So.2d 1215 (La.1984).

*Id.* at 1328. *See also State v. Marcantel*, 98-825 (La.App. 3 Cir. 12/22/99), 756 So.2d 366, *writ denied*, 00-208 (La. 8/31/00), 766 So.2d 1274, where the defendant's claim that admission of victim's videotaped statement violated his right to confrontation

21

was not considered on appeal because objections at trial were based upon the statutory requirements of La.R.S. 15:440.5, not constitutional considerations.

Defendant Runyon waived his objection to the admission of Defendant McDonald's statement against him.

*Excessive Sentence*

Defendant Runyon contends his forty-year sentence for manslaughter is excessive because he has no criminal history and is, at most, guilty of aggravated battery. Prior to imposing Defendant Runyon's sentence for manslaughter, the trial judge stated:

> Mr. Runyon, there's several factors involved. We are directing our attention now to the Manslaughter charge. There were several aggravating, very egregious circumstances here. Number one, in regard to you, you're the one that initiated the violence. You struck the victim with some sort of weapon, purportedly a log. That was the first stage in Daniel Wiley's eventual death, and the demise of that young man. You showed no remorse. You, also, attacked the young Dulworth boy from behind, or at least –
>
> . . . .
>
> He had no weapon, as it turned out. He had nothing. There were no deadly weapons involved. You initiated the deadly weapons into this particular scenario. And you did it on both victims. And these are several of the factors that are involved in your sentence.

Both Defendant Runyon and his attorney filed motions to reconsider sentence, which were denied.

The forty-year sentence Defendant Runyon received for his manslaughter conviction is the statutory maximum. La.R.S. 14:31. In *State v. Burnaman*, 03-1647, p. 5 (La.App. 3 Cir. 5/12/04), 872 So.2d 637, 641, this court considered the appropriateness of the imposition of maximum sentences, explaining:

> [M]aximum sentences are usually reserved for the most egregious and blameworthy of offenders. *State v. LeBlanc*, 578 So.2d 1036 (La.App.

22

3 Cir.1991), *writ denied*, 620 So.2d 833 (La.1993).  In reviewing the imposition of a maximum sentence, the First Circuit has held:

> This Court has stated that maximum sentences permitted under statute may be imposed only for the most serious offenses and the worst offenders, *State v. Easley*, 432 So.2d 910, 914 (La.App. 1 Cir.1983), or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality.  See *State v. Chaney*, 537 So.2d 313, 318 (La.App. 1 Cir.1988), *writ denied*, 541 So.2d 870 (La.1989).  A trial court's reasons for imposing sentence, as required by La.Code Crim. P. art. 894.1, are an important aid to this court when reviewing a sentence alleged to be excessive.  *State v. McKnight*, 98-1790 at p. 25, 739 So.2d [343]at 359 [(La.App. 1 Cir. 1999)].

Previously, the court addressed an excessive sentence claim in *State v. Barling*, 00-1241, 01-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, observing:

> La.Const. Art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment."  To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering.  *State v. Campbell*, 404 So.2d 1205 (La.1981).  The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion.  *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067.  The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.  *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes may be considered in determining whether a sentence is excessive.  *State v. Smith*, 99-606, 99-2015, 99-2019, 99-2094 (La.

23

7/6/00), 766 So.2d 501. The trial court is best suited to particularize the sentence because the trial judge is "in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784, p. 2 (La. 5/31/96), 674 So.2d 957, 958, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996).

Defendant Runyon did initiate the violence into this situation; however, he played a limited role in Mr. Wiley's death. He inflicted the wound on Mr. Wiley's head, but Defendant McDonald, unbeknownst to Defendant Runyon, subsequently inflicted six stab wounds. All seven wounds contributed to Mr. Wiley's death, but the nature and severity of the wounds inflicted by Defendant McDonald would have contributed more to Mr. Wiley's demise than the single wound inflicted by Defendant Runyon. Defendant Runyon's involvement pales in comparison to that of Defendant McDonald. For these reasons, we find Defendant Runyon is not one of our worst offenders, and the sentence imposed on him is excessive. Accordingly, we vacate his sentence and remand the case for re-sentencing.

### Defendant McDonald

### Specific Intent to Kill or Self-Defense

Defendant McDonald contends that the State failed to prove he had the specific intent to kill and that he did not act in self-defense. In the event this court finds he did not act in self-defense, he contends the record supports a reduction of his convictions to manslaughter and attempted manslaughter.

Defendant McDonald did not testify at trial, but the statement he gave to the police was played for the jury. In his statement, he said Mr. Wiley and Mr. Warren were engaged in a fist fight which was initiated by Mr. Wiley. After Defendant Runyon hit Mr. Wiley in the back of the head with a log and Mr. Dulworth had

24

Defendant Runyon on the ground, Defendant McDonald saw Mr. Dulworth reaching for something that he thought might be a weapon. Thinking Mr. Dulworth might be stabbing Defendant Runyon, Defendant McDonald stabbed Mr. Dulworth on his back and/or side. He was unsure of how many times he actually stabbed Mr. Dulworth. He said he stabbed Mr. Dulworth to get him off of his friend, stating: "I just reacted. I didn't think about it. . . I had the knife in my hand." Mr. Dulworth testified at trial that he never had a knife or any weapon in his hand and that he never reached for anything.

According to Defendant McDonald, Mr. Wiley then came at him and, forgetting he had his knife in his hand, he stabbed Mr. Wiley in his left arm to block his hit. They wrestled, and he stabbed Mr. Wiley once in the chest or the ribs before they ended up in the water. Defendant McDonald said Mr. Wiley had him under the water, trying to drown him. In an attempt to get away from Mr. Wiley, he stabbed him in the neck. Mr. Wiley fell back; the knife was still in his neck; Defendant McDonald pulled the knife out and ran off. He never saw Mr. Dulworth or Mr. Willis with a knife.

As previously discussed, Mr. Wiley's injuries were significant. Dr. Ross testified that at least two of his wounds required significant force to inflict. The force used to inflict the wound to Mr. Wiley's face was significant enough for the knife to penetrate the lower face then enter his chest. Two of the wounds were five inches deep, and one severed some of the arteries and veins in his neck.

> "Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." *State v. Carroll*, 95-859, p. 4 (La.App. 3 Cir. 1/31/96), 670 So.2d 286, 288. "Specific criminal intent is a state of mind and need not be proven as fact, but may be inferred from the circumstances present in the case and

from the action of the defendant." *Id*. at 289. The severity of the attack on the victim is an indicator of the defendant's specific intent to kill. *State v. Myers*, 584 So.2d 242 (La.App. 5 Cir.), *writ denied*, 588 So.2d 105 (La.1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992); *State v. Segura*, 464 So.2d 1116 (La.App. 3 Cir.), *writ denied*, 468 So.2d 1203 (La.1985).

*State v. Corley*, 97-235, p. 6 (La.App. 3 Cir. 10/8/97), 703 So.2d 653, 659, *writ denied,* 97-2845 (La. 3/13/98), 712 So.2d 875. Considering the location, number, and severity of the wounds, the evidence was sufficient for the jury to conclude that Defendant McDonald had the specific intent to kill Mr. Wiley.

Likewise, the jury could have inferred from the nature and severity of Mr. Dulworth's injuries, two of which were potentially fatal and one which was of the deepest wounds Dr. McGehee has ever seen, that Defendant McDonald had the specific intent to kill him as well.

Defendant McDonald claims he acted in self-defense when he stabbed Mr. Wiley and Mr. Dulworth. Louisiana Revised Statutes 14:20 provides in pertinent part:

A homicide is justifiable:

(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.

When a defendant in a homicide case claims he acted in self-defense, the State must prove beyond a reasonable doubt that he did not. *State v. Carrier*, 95-1003 (La.App. 3 Cir. 3/6/96), 670 So.2d 794, *writ denied*, 96-881 (La. 9/20/96), 679 So.2d 431.

The only evidence regarding the altercation between Defendant McDonald and Mr. Wiley came from Defendants McDonald's and Runyon's statements to police and Defendant Runyon's trial testimony. According to Defendant McDonald's statement

26

to police, his physical encounter with Mr. Wiley began right after he stabbed Mr. Dulworth in the back. According to Defendant McDonald, Mr. Wiley grabbed at him, and he swung at him to block his swing. He forgot he had his knife in his hand, and he stabbed Mr. Wiley in the arm. They struggled, and he stabbed Mr. Wiley again in the chest or the ribs. Defendant McDonald stated Mr. Wiley then tried to drown him, so he stabbed him in the neck in an attempt to get free.

In Defendant Runyon's statement to police, he stated that Mr. Wiley submerged Defendant McDonald in the water. They came up fighting, and Mr. Wiley was "acting like he was trying to stab at" Defendant McDonald. However, he acknowledged that he never saw a knife on Mr. Wiley and that Mr. Wiley may have been blocking his attacks.

Defendant McDonald admitted he never saw a knife in Mr. Wiley's hands while they were fighting. Mr. Wiley was 6'1" and 312 pounds, much larger than Defendant McDonald. Master Trooper Richard Ortego of the Louisiana State Police testified Defendant McDonald is short and weighed about 150 pounds at trial. Chief Deputy Rickey White of the Catahoula Parish Sheriff's Department testified that when Defendant McDonald was interviewed two days after the offense occurred, he had Defendant McDonald remove his shirt, and he did not observe any marks indicating that Defendant McDonald had been involved in a fight.

In light of his admission that he did not see Mr. Dulworth or Mr. Wiley with a weapon, Dr. Ross's identification of the wound on Mr. Wiley's left index finger as a defensive wound, and the lack of physical evidence on Defendant McDonald to support his claim that Mr. Wiley tried to drown him, a rational trier of fact could have

27

determined that he could not have reasonably believed his life was in imminent danger or that the deadly force he used was unnecessary.

Furthermore, a rational trier of fact could have also determined that Defendant McDonald was the aggressor in stabbing Mr. Dulworth and that Mr. Wiley was legitimately intervening in this attack on his step-brother. An aggressor who provokes the situation which ultimately places him in danger is precluded from claiming the right to self-defense, unless he withdraws from the situation in a manner that evidences his intent to terminate the conflict. La.R.S. 14:21. There is no evidence that Defendant McDonald withdrew from his confrontation with Mr. Wiley until he had inflicted all of his fatal wounds. There was evidence, however, that Defendant McDonald could not have reasonably believed his life was in imminent danger, when he stabbed Mr. Dulworth and Mr. Wiley. The State met its burden of proving Defendant McDonald did not act in self-defense.

As for Defendant McDonald's claim that he acted in defense of Defendant Runyon in stabbing Mr. Dulworth in the back, La.R.S. 14:22 provides:

> It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.

and La.R.S. 14:19 provides:

> The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.

28

Defendant Runyon testified he was face down on the ground with Mr. Dulworth on his back, hitting him in the back of the head for ten to thirty seconds. Mr. Dulworth testified he tackled Defendant Runyon in response to his attack on his step-brother; he denied having any weapon that night. He did not recall if he actually hit Defendant Runyon. Defendant Runyon testified Mr. Dulworth had put his knife away earlier, but he attempted to stab Mr. Dulworth because Mr. Dulworth was hitting him and he knew he had a knife.

Detective Ortego testified that Defendant Runyon is about six feet tall. Defendant Runyon testified that he weighed about 150 pounds at the time of the incident. Mr. Dulworth testified that he is about 5'7" or 5'8"; Dr. McGehee described him as a "big, muscular guy." Chief Deputy White testified that two days after the incident, Defendant Runyon had nothing more than a little scratch on his nose.

Defendant McDonald said he saw Mr. Dulworth reaching for something he thought was a weapon, and he thought he might be stabbing his friend. However, Mr. Dulworth testified that he never reached for anything, and Defendant McDonald admitted in his statement that he never actually saw a knife on Mr. Dulworth.

In non-homicide cases in which a defendant claims self-defense, the defendant bears the burden of proof by a preponderance of the evidence. *See State v. Charles*, 00-1611 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420, and *State v. Wright*, 99-1137 (La.App. 3 Cir. 3/1/00), 758 So.2d 301, *writ denied*, 00-1614 (La. 3/9/01), 786 So.2d 118. Defendant Runyon suffered no more than a scratch on his nose, and he testified that he was pinned on the ground by Mr. Dulworth for only ten to thirty seconds. Mr. Dulworth testified he did not have a weapon in his possession that night and, even if he did, Defendant Runyon testified

29

he had put it up earlier. More importantly, Defendant McDonald did not see a weapon on Mr. Dulworth.

Based on these facts, it was reasonable for the jury to find that Defendant McDonald's efforts to protect Defendant Runyon by stabbing Mr. Dulworth multiple times and inflicting life-threatening injuries were not justifiable under these circumstances. Therefore, he did not meet his burden of proof.

Finally, Defendant McDonald contends the record supports a reduction of his convictions to manslaughter and attempted manslaughter because he established the mitigating factors of sudden passion or heat of blood by a preponderance of the evidence. In *State v. Charles*, 787 So.2d at 519, this court stated:

> It is the defendant's burden to prove by a preponderance of the evidence that there are such mitigating factors as "heat of blood" or "sudden passion." *State v. Baldwin*, 96-1660 (La.12/12/97); 705 So.2d 1076. "Heat of blood" or "sudden passion" is defined by case law as an act committed in response to such provocation sufficient to deprive an average person of his self-control and cool reflection. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98); 720 So.2d 829. . . . Case law requires that there be some act or series of acts by the *victim* sufficient to deprive a reasonable person of cool reflection. *State v. Jack*, 596 So.2d 323 (La.App. 3 Cir.1992), *writ denied*, 92-1052 (La.6/5/92); 600 So.2d 611. Further, an argument alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98); 720 So.2d 829, citing *State v. Gauthier*, 546 So.2d 652 (La.App. 4 Cir.1989).

Provocation is a question of fact to be determined by the trier of fact. *State v. Miller*, 37,472 (La.App. 2 Cir. 3/3/04), 868 So.2d 239, *writ denied*, 04-1127 (La. 10/8/04), 883 So.2d 1027. We must determine if it was reasonable for the jury to conclude that Defendant McDonald did not prove the mitigating factors by a preponderance of the evidence as it relates to his stabbing of Mr. Dulworth.

Mr. Dulworth, who was unarmed, tackled Defendant Runyon in response to his attack on Mr. Wiley. According to Defendant Runyon's own testimony,

30

Mr. Dulworth was only on him for ten to thirty seconds and Mr. Dulworth did not use a weapon. Defendant McDonald admitted he did not see a knife on Mr. Dulworth. Based on this evidence, we find no error with the jury's conclusion that he failed to establish that he acted in response to provocation sufficient to deprive an average person of his self-control.

Likewise, Defendant McDonald did not prove the mitigating factors of manslaughter with respect to his stabbing of Mr. Wiley. When Mr. Wiley approached him, Defendant McDonald was already involved in the altercation and had stabbed Mr. Dulworth multiple times. Mr. Wiley was attempting to protect his step-brother, when he sought out Defendant McDonald. Although he was much larger than Defendant McDonald, Mr. Wiley was unarmed and had suffered a blow to his head. Based on the record, the jury could have reasonably concluded that Mr. Wiley's actions were not sufficient to deprive a reasonable person of his self-control and cool reflection. Defendant McDonald's convictions of second degree murder and attempted second degree murder are affirmed.

### *Change of Venue*

In this assignment of error, Defendant McDonald contends the trial court erred in denying Defendant Runyon's motion for change of venue and allowing the trial to be held in Catahoula Parish. Counsel for Defendant Runyon filed a motion for change of venue. The motion was heard June 3, 2003. Defendants' cases were not consolidated for trial until February 17, 2004.

Louisiana Code of Criminal Procedure Article 842 provides:

> If an objection has been made when more than one defendant is on trial, it shall be presumed, unless the contrary appears, that the objection has been made by all the defendants.

31

In *State v. Bergeron*, 371 So.2d 1309, 1313 (La.1978), the supreme court stated, "By analogy, the provision of C.Cr.P. 842 should be extended to written motions by a co-defendant." At the time of the hearing on the motion for change of venue, the cases against these Defendants had not been consolidated. Counsel for Defendant Runyon informed the court that he did not believe he could adequately argue the motion until he knew whether the cases would be consolidated. Despite counsel's concerns, the court proceeded to address the motion.

As these cases had not been consolidated at the time of this hearing, it was impossible for the court to consider the objection as having been made by both Defendant Runyon and Defendant McDonald. After the cases were consolidated, Defendant McDonald did not file a motion for change of venue; therefore, he cannot now complain. Additionally, there is no basis in the record for Defendant McDonald to challenge the trial court's denial of a motion filed Defendant Runyon.

Defendant McDonald contends that if this court finds the trial court did not abuse its discretion in denying the motion "due to trial counsel's failure to produce any evidence in support, then it should be held that *both trial counsel* were ineffective in failing to do so." (Emphasis added). He does not cite any authority granting him standing to raise an ineffective assistance counsel claim regarding his co-defendant's attorney, and we have not found any.

It appears from Defendant McDonald's argument that he contends his counsel was ineffective in failing to present evidence at the hearing on the motion. However, the cases had not been consolidated at that time, and there is no evidence that his attorney had joined in Defendant Runyon's motion or was even aware of the motion. Based on these facts, we assume Defendant McDonald is claiming his counsel was

ineffective in failing to file and successfully argue a motion for a change of venue. Such a claim concerns trial strategy and, as such, is better suited to post-conviction relief where the record can be more fully developed regarding this issue. *See State v. Benedict*, 04-742 (La.App. 3 Cir. 11/10/04), 887 So.2d 649. Accordingly, this assignment of error is denied.

### *Excessive Sentence*

Defendant McDonald contends his sentences are excessive and the trial court erred in ordering the sentences to run consecutively. Citing *State v. Dorthey*, 623 So.2d 1276 (La.1993), and *State v. Sepulvado*, 367 So.2d 762 (La.1979), he contends that his mandatory life sentence for a second-degree murder conviction is too severe and that he should either be resentenced or a more appropriate sentence should be imposed by this court.

In *State v. Paddio*, 02-722, pp. 16-17 (La.App. 3 Cir. 12/11/02), 832 So.2d 1120, 1131, *writ denied*, 03-402 (La. 2/13/04), 867 So.2d 682 (citations omitted), this court discussed the imposition of life sentences under La.R.S. 14:30.1, stating:

> [A] court may depart from a minimum sentence only if it finds that there is clear and convincing evidence that rebuts the presumption of constitutionality. To rebut the presumption, a defendant must show, by clear and convincing evidence, that, "because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case."

Defendant McDonald set forth no mitigating reasons why his sentence is cruel, unusual, or too severe. He makes no attempt to set forth unusual circumstances that rebut the presumption of constitutionality; thus he has failed to meet his burden of proof on this point. The gravity of the offense merits the punishment prescribed by the legislature, and Defendant McDonald makes no showing to the contrary.

33

As discussed above, we are remanding this matter to the trial court to correct the patent error found with Defendant McDonald's sentence for second degree murder and, therefore, do not address his assignment of error that his sentence for attempted second degree murder is excessive.

Finally, Defendant McDonald contends the trial court erred in ordering his sentences to run consecutively. He urges that his criminal background and the circumstances of this case do not justify the imposition of consecutive sentences. He raised this issue in his motion to reconsider sentence, and at the hearing on the motion, the trial court explained its reasons for imposing consecutive sentences as follows:

> I'm not going to repeat the factors enumerated by the Court at that time, [sentencing] except to say this was a particularly egregious crime that the victim was brutally attacked with a knife in a very gruesome manner. The Court did indicate, I think, at the time of sentencing that Mr. McDonald was not the one that instigated this matter, basically someone of his cohorts, that's the only redeeming thing I can see about Mr. McDonald is that he and the deceased were getting along fine until Mr. McDonald's cohorts came up and started this confrontation. But, once it started, Mr. McDonald took charge. And he took charge in a very effective manner. He, but for the grace of God, would have killed two people instead of one. He was very effective in wielding his knife, and the Court thinks that the seriousness of the crime requires that the sentence remain as originally imposed.

Louisiana Code of Criminal Procedure Article 883 states:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.

In *State v. Walker*, 00-3200, p. 1-2 (La. 10/12/01), 799 So.2d 461, 461-62, the supreme court discussed factors to consider in determining whether a consecutive sentence is appropriate:

> Although La.C.Cr.P. art. 883 favors imposition of concurrent sentences for crimes committed as part of the same transaction or series of transactions, a trial court retains the discretion to impose consecutive penalties in cases in which the offender's past criminality or other circumstances in his background or in the commission of the crimes justify treating him as a grave risk to the safety of the community.

Defendant McDonald attacked two unarmed men and, using a substantial amount of force, inflicted numerous horrific wounds. As a result of his attack, one man died and another suffered life-threatening injuries. Considering the violence of these offenses and the obvious threat to society presented by him, the trial court did not abuse its discretion by ordering Defendant McDonald's sentences to run consecutively.

### *Disposition*

Defendant Runyon's conviction for manslaughter is affirmed; his conviction for attempted second degree murder is reversed. Both of his sentences are vacated, and the case is remanded for re-sentencing on his convictions of manslaughter and aggravated battery.

Defendant McDonald's convictions are affirmed. His sentence for second degree murder is affirmed, but his sentence for attempted second degree murder is vacated, and the case remanded for re-sentencing. The trial court is instructed that the entirety of the sentence imposed for attempted second degree murder must be served without benefit of parole, probation, or suspension of sentence.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**