STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-823

STATE OF LOUISIANA

VERSUS

DUSTIN K. RUNYON

************

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT,
PARISH OF CATAHOULA, NOS. 03-0736 and 03-0817,
HONORABLE LEO BOOTHE, DISTRICT JUDGE

************

MICHAEL G. SULLIVAN
JUDGE

************

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Michael G. Sullivan, Judges.

AFFIRMED.

John F. Johnson
District Attorney
Bradley R. Burget
Assistant District Attorney
4001 Carter Street, Suite 9
Vidalia, Louisiana 71373
(318) 336-5526
Counsel for:
        State of Louisiana

G. Paul Marx
Louisiana Appellate Project
Post Office Box 82389
Lafayette, Louisiana 70598-2389
(337) 237-2537
Counsel for Defendant/Appellant:
        Dustin K. Runyon

SULLIVAN, Judge.

Dustin Runyon was convicted of manslaughter and attempted second degree murder. He was sentenced to forty years at hard labor for his manslaughter conviction and forty years at hard labor with ten years of the sentence being without the benefit of parole, probation, or suspension of sentence for his attempted second degree murder conviction. The two sentences were ordered to run concurrently.

On appeal, Defendant's conviction for manslaughter was upheld, but his conviction for attempted second degree murder was reversed on the basis that the evidence supported only a verdict of aggravated battery. Therefore, a conviction for the lesser offense of aggravated battery was entered, and the matter was remanded for resentencing on that conviction. Defendant's sentence of forty years, the maximum, on his conviction for manslaughter was found to be excessive under the facts of this case, and the matter was remanded for resentencing on that conviction as well. *State v. Runyon*, 05-36, 05-104 (La.App. 3 Cir. 11/2/05), 916 So.2d 407, *writ denied*, 06-1348 (La. 9/1/06), 936 So.2d 207.

On remand, the trial court sentenced Defendant to ten years for his aggravated battery conviction and thirty years for his manslaughter conviction and ordered that the sentences run consecutively. Defendant was given thirty-six months to file a motion to reconsider sentence, but no motion to reconsider sentence was filed. Defendant contends that the trial court erred in imposing the same sentence on remand of the case in direct violation of this court's order and that his two sentences are excessive because they total forty years.

### Facts

The facts are taken from this court's opinion in the original appeal:

> On the night of March 8, 2003, Defendant Runyon, his sister, Jamie Bailey, her boyfriend, Defendant McDonald, and friends William

Meredith and Keith Warren went fishing at Larto Lake in Catahoula Parish. After they were there for about three and one-half to four hours, the victims, Mr. Dulworth and Mr. Wiley, and their friend, Amy Denny, arrived. An altercation occurred between the two parties, which resulted in Mr. Wiley's death and Mr. Dulworth being seriously injured.

Defendants Runyon and McDonald, Mr. Warren, Mr. Meredith, and Ms. Bailey presented themselves to the Catahoula Sheriff's Department the evening of March 10, 2003, after learning Mr. Wiley died as a result of injuries inflicted during the altercation. They all made statements to the police. Defendant Runyon's and Defendant McDonald's audio statements were played for the jury during the trial. Mr. Dulworth, Ms. Denny, and Defendant Runyon testified at trial about the events that transpired that night upon their arrival at Larto Lake.

Mr. Dulworth testified that, earlier in the day, he, Ms. Denny, her brother Barrett, and Mr. Wiley went to a camp at Larto Lake. In the evening, they left the camp and went to Noble's Bar. Mr. Dulworth testified that he consumed alcohol at the camp, but not at the bar because he was only eighteen years old at the time. He also testified that Mr. Wiley consumed alcohol at the camp and at the bar and was intoxicated. The group of four left the bar around 9:00 p.m. Barrett Denny was dropped off at home. The other three, who were in Ms. Denny's car, picked up Mr. Wiley's truck, a jacked-up 4x4 Chevy Blazer, to go mud riding. Mr. Wiley drove to the dam near the bridge "where all the kids go." Mr. Dulworth testified that upon their arrival, they saw a couple of vehicles down by a fire. Thinking it might be someone they knew, Mr. Wiley drove down the hill and turned around in the water. Mr. Dulworth testified that Mr. Wiley "cut a little donut" in the water; Ms. Denny testified that Mr. Wiley spun his tires. Ms. Bailey and Defendant McDonald were fishing nearby. Mr. Wiley pulled up to the couple and asked if they were catching any fish; he was not belligerent, mean, or condescending. While Mr. Wiley was talking to the couple, Defendant Runyon, Mr. Meredith, and Mr. Warren, who were fishing on the other side of the lake, came over to where Mr. Wiley had stopped.

According to Mr. Dulworth, one of these three men was worried that Mr. Wiley might have run over Ms. Bailey and/or Defendant McDonald, and "a little argument" arose. Mr. Dulworth testified that he did not recall Mr. Wiley's response to the bickering because he was not paying close attention to what was going on, but he testified he would have noticed if Mr. Wiley had gotten loud. Mr. Dulworth testified that one of the three guys told them to go to the other side of the road and that he understood the comment to mean they wanted to fight.

Ms. Denny testified she was sitting between Mr. Wiley and Mr. Dulworth and Mr. Wiley did not get mad, scream, or curse at the guys.

2

One of the three guys repeatedly told Mr. Wiley that he almost ran over Ms. Bailey and Defendant McDonald. According to Ms. Denny, Mr. Wiley was apologetic and said he did not mean to scare the couple. She identified Defendant Runyon as the most vocal of the group and testified that he told them they could handle things across the bridge. According to Ms. Denny, Mr. Wiley agreed to go to the other side of the bridge, but "he kind of laughed . . . like it was a joke." Mr. Wiley drove down the road, turned around, drove back, then pulled his truck off on the other side of the road.

Mr. Dulworth testified that, as they were sitting there, the others told them to come back. Ms. Denny testified that, when they got to the location where they were told to go, no one was there, so they went back up to the bridge and stopped near the back of Defendants' trucks. Mr. Wiley pulled his truck in front of their trucks and got out; Mr. Dulworth followed. Mr. Wiley and Mr. Dulworth then walked over to the Defendants and their friends. Mr. Wiley and the others argued back and forth, but according to Mr. Dulworth, Mr. Wiley was not being loud or obnoxious. Mr. Dulworth returned to the cab of the truck to get a cigarette from Ms. Denny. When Mr. Dulworth walked back to the others, Mr. Wiley was walking toward his truck saying, "We're leaving." As Mr. Dulworth started climbing back in the truck, he heard one of the guys tell Mr. Wiley to "suck my dick." Mr. Wiley then climbed back out of the truck and followed the guys down the hill. As Mr. Wiley was walking down the hill, Mr. Dulworth heard him say "I have permission to whip your ass" in response to the comment.

Ms. Denny testified that the conversation got louder when she and Mr. Dulworth went to the truck to get a cigarette. As she was climbing back in the truck, Mr. Dulworth told her to call her cousin Casey. According to Ms. Denny, Mr. Dulworth said this because "there was five of them—and Daniel and Willis." Mr. Dulworth and Ms. Denny testified that they did not hear anyone ask Mr. Wiley to leave them alone or that they be allowed to leave.

According to Mr. Dulworth, Mr. Wiley had no gun, knife, pipe, or object of any kind with him. He saw Mr. Wiley and Mr. Warren, the guy who made the "suck" comment, fighting down by the water. Mr. Dulworth saw Mr. Wiley push Mr. Warren, but he does not know who made the initial contact. According to Mr. Dulworth, Defendant Runyon ran toward Mr. Wiley, picked up what appeared to be a log, and hit Mr. Wiley "across the back, or head." Mr. Dulworth then tackled Defendant Runyon; they fell into the fire and rolled off of it. Mr. Dulworth testified he stayed on top of Defendant Runyon, fighting him, to keep him on the ground. He does not remember if he hit Defendant Runyon. He also testified that he had no knife or weapon in his hand and that he never reached for anything while he fought with Defendant Runyon.

3

While on top of Defendant Runyon, Mr. Dulworth felt something repeatedly hitting him in the back and began to feel weak. He got off Defendant Runyon. While he was lying on the ground, Mr. Meredith, who had his hand out, came up and told him to stay on the ground or he would get cut. Mr. Dulworth testified that he saw something in Mr. Meredith's hand, although he said it could have been his finger. Later, he testified that he did not know if Mr. Meredith had anything in his hand. In his statement to police, Mr. Dulworth said he saw a knife in Mr. Meredith's hand.

Mr. Dulworth testified he then saw Mr. Warren running out of the water from near Mr. Wiley. Defendants Runyon and McDonald and their friends ran to their trucks and left. As they were leaving, Mr. Dulworth heard Mr. Wiley hit the water. He made his way over to him but could not do anything for him because he himself was "passing in and out." Mr. Dulworth testified he told Ms. Denny to call for help.

Mr. Dulworth does not know who stabbed him or Mr. Wiley. At trial, he confirmed that, in his statements to police, he suggested that the guy he was wrestling, Defendant Runyon, was not the one who stabbed Mr. Wiley because he had tackled him. A knife found on the scene was shown to Mr. Dulworth at trial, but he did not recognize it. The knife was sent to a laboratory for testing; it was not analyzed before trial due to the facility's backlog.

Mr. Dulworth knew his step-brother for about four years before his death. He testified that he did not know him to be quick to react or to fight when drunk. According to Mr. Dulworth, Mr. Wiley was funny and laughing when drunk. Ms. Denny, who grew up with Mr. Wiley, described him as sweet, lovable, like a "big teddy bear." She, too, had never known him to get in fights or cause trouble, and she testified that his behavior did not change when he drank. Other witnesses also testified that Mr. Wiley was a gentle giant and not a fighter or a bully. However, none of these witnesses testified that they had been around him when he was intoxicated.

Dr. Karen Ross, an assistant coroner and forensic pathologist with the Jefferson Parish Coroner's Office, performed an autopsy on Mr. Wiley. According to Dr. Ross, Mr. Wiley was 6'1" and weighed 312 pounds. The cause of his death was blood loss which resulted from seven sharp force injuries inflicted on him. He had one wound on the back of his left upper arm, which was three and one-quarter inches long and five inches deep. Another wound on the back of his arm was three-quarter by one-half inch long and one and three-quarter inches deep. A cut on his back was two and three-quarter inches long and one and three-quarter inches deep. A stab wound on his face and chin was one inch long; it went through his lip, the periosteum (the soft tissue lining the jaw), the floor of the mouth, then entered his "upper chest,

lower neck region." Dr. Ross testified that significant force was required to penetrate through the periosteum of the jaw. Mr. Wiley had a wound on his right upper neck, which was five inches deep that went through the muscles of the right side of his neck and transected some of the smaller branches of the subclavian artery and the left subclavian artery and vein. According to Dr. Ross, this wound also took a lot of force to inflict.

Mr. Wiley also had a cut on his head, which Dr. Ross testified differs from a stab wound in that it is longer than it is deep. When asked whether she could determine what caused this cut, Dr. Ross testified it was "a single edged instrument such as a knife." However, she acknowledged during questioning by the State that it was "possible" that this wound could have been caused by the "sharp edge" of a log.

Dr. Clinton McGehee, the surgeon who cared for Mr. Dulworth, testified Mr. Dulworth had four stab wounds to his back, three to the left of his midline and one to the right. The three wounds on his left side were on his upper torso, in the area just above his belt, and close to the spine. The wound on the right side was four inches or more on the right side of the spine.

As a result of his injuries, Mr. Dulworth's left lung collapsed and blood collected in the left side of his chest. He also had a penetrating injury to his spleen which was one of the deepest wounds Dr. McGehee has ever seen. Because the skin on the back is fairly thick and Mr. Dulworth is a big, muscular guy, Dr. McGehee felt this particular wound required a great deal of force to inflict. The other wounds on the left side of his back were smaller and not large enough for Dr. McGehee to determine the depth. Although Dr. McGehee acknowledged it was possible that one stab wound caused both of these smaller injuries, he felt they were more likely caused by different wounds. He testified there was no way to make a definitive determination. The wound on the right side of Mr. Dulworth's back did not result in any intra thoracic injuries or intra abdominal injuries; therefore, Dr. McGehee felt that wound did not penetrate all the way into the chest cavity. Both the injury that caused the collapsed lung and the one that pierced Mr. Dulworth's spleen were potentially fatal.

Dr. McGehee was asked hypothetically if Mr. Dulworth had someone pinned face down on the ground and that person had a knife in their right hand, whether the person could reach around and inflict the wound on Mr. Dulworth's right side. Dr. McGehee did not think the person could inflict the wounds on either side because Mr. Dulworth is a "big guy," and he did not think the person's arm could go that far back. In a demonstration with counsel, Dr. McGehee indicated that it might be possible if the person was "really cooperative."

5

*Runyon*, 916 So.2d at 412-16.

### *Sentence*

### <u>*Did the Trial Court violate this Court's Order?*</u>

Defendant urges that the trial court imposed the same sentence on him in violation of this court's order. He claims that the trial court rejected this court's holding that co-defendant McDonald was the instigator in the fight, rendering this court's opinion "moot." In support of this claim, he refers to this court's opinion where we stated:

> Defendant Runyon did initiate the violence into this situation; however, he played a limited role in Mr. Wiley's death. He inflicted the wound on Mr. Wiley's head, but Defendant McDonald, unbeknownst to Defendant Runyon, subsequently inflicted six stab wounds. All seven wounds contributed to Mr. Wiley's death, but the nature and severity of the wounds inflicted by Defendant McDonald would have contributed more to Mr. Wiley's demise than the single wound inflicted by Defendant Runyon. Defendant Runyon's involvement pales in comparison to that of Defendant McDonald. For these reasons, we find Defendant Runyon is not one of our worst offenders, and the sentence imposed on him is excessive. Accordingly, we vacate his sentence and remand the case for re-sentencing.

*Id.* at 424. Contrary to Defendant's contention, this passage reveals that *he initiated the violence*, but then played a limited role in the death of Mr. Wiley.[1]

---

[1] We observe that Defendant may erroneously be referring to that portion of our opinion where co-defendant McDonald's claim that he acted in self-defense in stabbing Mr. Wiley and Mr. Dulworth was addressed:

> Furthermore, a rational trier of fact could have also determined that Defendant McDonald was the aggressor in stabbing Mr. Dulworth and that Mr. Wiley was legitimately intervening in this attack on his step-brother. An aggressor who provokes the situation which ultimately places him in danger is precluded from claiming the right to self-defense, unless he withdraws from the situation in a manner that evidences his intent to terminate the conflict. La.R.S. 14:21. There is no evidence that Defendant McDonald withdrew from his confrontation with Mr. Wiley until he had inflicted all of his fatal wounds. There was evidence, however, that Defendant McDonald could not have reasonably believed his life was in imminent danger, when he stabbed Mr. Dulworth and Mr. Wiley.

*State v. Runyon*, 916 So.2d at 426.

6

Defendant claims that the trial court erred in resentencing him to the same term because this court previously held his forty-year sentence was excessive. He acknowledges that the trial court reduced his manslaughter sentence by ten years but claims that the imposition of consecutive sentences violates this court's order because it is "a fiction without any substantial difference and amounts to a rhetorical change in the result of the trial court without any substance or affect [sic]."

In Defendant's first appeal, his forty-year sentence for manslaughter was found to be excessive and resentencing for that conviction was ordered. Defendant was subsequently resentenced to thirty years at hard labor for manslaughter which sentence was to run consecutively to the ten-year sentence imposed for the conviction of aggravated battery. While the "net effect" of the sentences on the two charges is forty years, the trial court did reduce the manslaughter sentence by ten years, which complies with this court's order.

Further, there was no violation of *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072 (1969), which prohibits a harsher sentence being imposed after a defendant successfully has his original conviction reversed on appeal. In *State v. Freeman*, 577 So.2d 216 (La.App. 1 Cir.), *writ denied*, 580 So.2d 668 (La.1991), the defendant was originally sentenced as a habitual offender to concurrent sentences of twenty-four years at hard labor for simple burglary and twenty years at hard labor for theft. His habitual offender adjudication was later vacated, and he was subsequently resentenced to consecutive sentences of twelve years at hard labor for simple burglary and ten years at hard labor for theft. The first circuit found no *Pearce* violation, stating:

> Initially, we note that there is no *Pearce* violation because the defendant did not receive increased sentences upon resentencing. Although the trial court ordered the instant sentences to run consecutively, rather than concurrently (as it had done at the original

7

sentencing hearing), there is no indication that the trial court was being vindictive. Instead, by imposing sentences totaling twenty-two years at hard labor, the trial court was obviously trying to come as close to its original sentencing scheme (a total of twenty-four years at hard labor) as possible. (FN1)

_____

[1]As the United States Supreme Court has recognized, the *Pearce* presumption is restricted to circumstances "in which there is a 'reasonable likelihood' . . . that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 2205, 104 L.Ed.2d 865 (1989) (citations omitted). Where the court "merely impose[s] the same sentence for the same conduct," the sentence has not been increased and the *Pearce* presumption is inapplicable. *United States v. Cataldo*, 832 F.2d 869, 875 (5th Cir.1987), *cert. denied*, 485 U.S. 1022, 108 S.Ct. 1577, 99 L.Ed.2d 892 (1988).

*Id.* at 218-19.

We find no merit in Defendant's argument that the trial court violated this court's order.

### *Excessive Sentence*

Defendant urges that he was guilty of two counts of aggravated battery at worst and that the trial court's imposition of a sentence which equals the maximum sentence of forty years for manslaughter is excessive. He further claims:

> The failure to abide by the terms of the Court of Appeal ruling in this case is reversible error, particularly where the defendant shows remorse and rehabilitation and where the Trial Court reiterated his original sentencing considerations despite the Court of Appeal holding that those did not justify a 40 year term of imprisonment.

Defendant is obviously challenging the length of his sentences, as well as their consecutive nature. *See State v. Dixon*, 04-1019 (La.App. 5 Cir. 3/15/05), 900 So.2d 929.

Louisiana Code of Criminal Procedure Article 881.1(E) provides:

> Failure to make or file a motion to reconsider sentence or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review.

8

The record does not contain a written motion to reconsider sentence and does not indicate that Defendant orally objected to his sentence at the sentencing hearing. However, the record does reflect that after being sentenced Defendant stated, "Note my appeal . . . I will file an appeal on this." This statement is insufficient to constitute an oral motion to reconsider sentence. *See State v. Green*, 94-617 (La.App. 3 Cir. 12/7/94), 647 So.2d 536, and *State v. Sabathe*, 93-860 (La.App. 5 Cir. 2/23/94), 633 So.2d 761. Accordingly, Defendant is precluded from raising any objection to his sentences on appeal. La.Code Crim.P. art. 881.1(E). However, this court has reviewed sentences for bare excessiveness in the interest of justice when no motion to reconsider was filed. *See State v. Jeansonne*, 06-263 (La.App. 3 Cir. 5/31/06), 931 So.2d 1258, 1262-63, where this court set forth the standard to be employed in determining whether a sentence is excessive:

> [Louisiana Constitution Article I], § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

In order to decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, we have held:

> [A]n appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste,* 594 So.2d 1 (La.App. 1 Cir. 1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-0562 (La. 5/30/03), 845 So.2d 1061.

At the resentencing proceeding, the trial court stated the following reasons in support of the sentences it imposed:

> All right. As indicated at the previous sentencing, there are several factors involving Mr. Runyon. Mr. Runyon was the one that initiated the matter. He struck Mr. Wiley, the victim, with some sort of weapon. He also was involved in attacking the young Dulworth boy from behind. None of the victims had any weapons or any deadly weapons. There are several egregious factors which I had recited at the previous sentencing which I will incorporate in this on both matters.

Defendant then read a letter to the court informing the court of his progress during confinement and stated that he never wanted any of this to happen to his family or any of the families involved. Thereafter, the trial court stated:

> All right. That's very commendable. I think the statements and concerns you related probably didn't dwell enough or reflect on what happened to the Wiley family and what happened to the victim in this matter.
>
> . . . .

10

And I think more regrets and remorse should be shown; they're the ones that suffered.

. . . .

And I know your family also has some problems. I'm sure the Wileys would swap places with you right now. Let him be sitting there and you be where he is in a heartbeat. But what you related to the Court during your statement is commendable. And you're headed in the right direction.

The trial court also incorporated the reasons provided at the original sentencing as reasons for the sentences imposed at resentencing. At the original sentencing, the trial court stated:

Mr. Runyon, there's several factors involved. We are directing our attention now to the Manslaughter charge. There were several aggravating, very egregious circumstances here. Number one, in regard to you, you're the one that initiated the violence. You struck the victim with some sort of weapon, purportedly a log. That was the first stage in Daniel Wiley's eventual death, and the demise of that young man. You showed no remorse. You, also, attacked the young Dulworth boy from behind, or at least --

. . . .

**THE COURT:**

And the wounds found and testified to by the expert witnesses who did the autopsy were consistent with your story. And this was a young man barely of the age of majority. A young, naive boy who was attempting to protect his brother. And you viciously attacked him. Of course, he was just trying to remove you when you struck the victim, Daniel Wiley, with a device that we've already mentioned. He had no weapon, as it turned out. He had nothing. There were no deadly weapons involved. You initiated the deadly weapons into this particular scenario. And you did it on both victims. And these are several of the factors that are involved in your sentence.

*Manslaughter*

On the manslaughter conviction, Defendant faced a sentence of no more than forty years at hard labor. La.R.S. 14:31. A thirty-three-year sentence for manslaughter has been held not to be excessive for a first-offender defendant who was a principal

to a drive-by shooting. *State v. Bowman*, 95-667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094, *writ denied*, 96-2070 (La. 1/31/97), 687 So.2d 400.

We find no abuse of discretion by the trial court in its imposition of a thirty-year sentence, ten years less than the maximum, for manslaughter in this case.

### *Aggravated Battery*

The trial court imposed the maximum sentence of ten years at hard labor for Defendant's aggravated battery conviction. Defendant could have also been ordered to pay a fine of not more than $5,000 in addition to his prison sentence. La.R.S. 14:34. As noted in the original appeal of this case:

> In *State v. Burnaman*, 03-1647, p. 5 (La.App. 3 Cir. 5/12/04), 872 So.2d 637, 641, this court considered the appropriateness of the imposition of maximum sentences, explaining:
>
>> [M]aximum sentences are usually reserved for the most egregious and blameworthy of offenders. *State v. LeBlanc*, 578 So.2d 1036 (La.App. 3 Cir.1991), *writ denied*, 620 So.2d 833 (La.1993). In reviewing the imposition of a maximum sentence, the First Circuit has held:
>>
>>> This Court has stated that maximum sentences permitted under statute may be imposed only for the most serious offenses and the worst offenders, *State v. Easley*, 432 So.2d 910, 914 (La.App. 1 Cir.1983), or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. See *State v. Chaney*, 537 So.2d 313, 318 (La.App. 1 Cir.1988), *writ denied*, 541 So.2d 870 (La.1989). A trial court's reasons for imposing sentence, as required by La.Code Crim. P. art. 894.1, are an important aid to this court when reviewing a sentence alleged to be excessive. *State v. McKnight*, 98-1790 at p. 25, 739 So.2d [343] at 359 [(La.App. 1 Cir.1999)].

*State v. Runyon*, 916 So.2d at 423-24.

We find no abuse of discretion by the trial court in its imposition of the maximum sentence for aggravated battery in light of the fact that Defendant instigated the attack on an unarmed victim[2] and Defendant has shown limited remorse.

***Consecutive Sentences***

Defendant next contests the trial court's imposition of consecutive sentences. Challenges to the imposition of consecutive sentences have been considered by this court in reviews for bare excessiveness. *State v. Day*, 05-287 (La.App. 3 Cir. 11/2/05), 915 So.2d 950. In *State v. Vollm*, 04-837 (La.App. 3 Cir. 11/10/04), 887 So.2d 664, this court stated that the defendant's failure to present the issue of the consecutive nature of his sentences in his motion to reconsider relegated him to a bare claim of constitutional excessiveness on appeal. However, we went on to review the imposition of consecutive sentences, finding the trial court did not abuse its discretion in imposing them.

In *Vollm*, additional factors to be considered when assessing whether the trial court abused its discretion in imposing consecutive sentences were identified:

> Louisiana Code of Criminal Procedure Article 883 states in relevant part: "If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently *unless the court expressly directs that some or all be served consecutively*." (Emphasis added.) The Louisiana Supreme Court has recognized that although concurrent sentencing is favored, it is within the trial judge's discretion to impose sentences consecutively based on factors including the defendant's criminal record, the severity or violent nature of the crimes, or the danger the defendant poses to the public. *State v. Thomas*, 98-1144 (La.10/9/98), 719 So.2d 49.
>
> Where the trial court does impose consecutive penalties, it "must articulate particular justification for such a sentence beyond a mere articulation of the standard sentencing guidelines set forth in La.C.Cr.P.

_____

[2] Defendant acknowledged that Mr. Dulworth had put up his knife before Mr. Dulworth had pinned him on the ground.

art. 894.1" *State v. Merritt*, 03-946, p. 28 (La.App. 3 Cir. 3/17/04), 875 So.2d 80, 97 (*quoting State v. Dempsey*, 02-1867, p. 5 (La.App. 4 Cir. 4/2/03), 844 So.2d 1037, 1040, *writ denied*, 03-1917(La.6/25/04), 876 So.2d 823).

*Id.* at 669.

The two offenses in this case arose out of the same course of conduct; therefore, concurrent sentences are favored. However, the trial court had the discretion to impose consecutive sentences. Defendant initiated a violent attack of four armed men against two unarmed men in which the first victim, Mr. Wiley, was killed, and he exhibited little or no remorse to the trial court for his actions. We find no error with the trial court's imposition of consecutive sentences.

### Errors Patent

All appeals are reviewed for errors patent on the face of the record. No errors patent were found on review.

### Disposition

The sentences imposed by the trial court are affirmed.

**AFFIRMED**.

14