# NOT DESIGNATED FOR PUBLICATION

## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-806

## STATE OF LOUISIANA

## VERSUS

## MARCUS DEVON MCCRAY

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, DOCKET NO. 301,842
HONORABLE JOHN C. DAVIDSON, PRESIDING

**********

## SYLVIA R. COOKS
## JUDGE

**********

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

Beth S. Fontenot
Louisiana Appellate Project
P.O. Box 3183
Lake Charles, LA 70602-3183
(337) 491-3864
COUNSEL FOR DEFENDANT/APPELLANT:
    Marcus Devon McCray

James C. Downs, District Attorney
Monique Y. Metoyer, Assistant District Attorney
Ninth Judicial District Court, Parish of Rapides
P.O. Drawer 1472
Alexandria, LA 71309
(318) 473-6650
COUNSEL FOR APPELLEE:
    State of Louisiana

**COOKS, Judge.**

On Saturday, January 30, 2010, the Alexandria Police Department was called to investigate the disappearance of Chiquina Robinson. The police were called by Ms. Robinson's family after family members went to her apartment and questioned Defendant, Marcus Devon McCray, who was Ms. Robinson's boyfriend. After arrival, it was determined by police that the apartment was a potential crime scene. Following a series of interviews with Defendant, he confessed to killing the victim.

On April 29, 2010, Defendant was indicted by a grand jury for second degree murder, a violation of La.R.S. 14:30.1. Following a jury trial, Defendant was found guilty as charged. Defendant was sentenced to life imprisonment at hard labor, to be served without benefit of parole, probation, or suspension of sentence.

Defendant is now before this court on appeal, challenging the sufficiency of the evidence to support his conviction. Defendant also contends that the trial court erred in denying his motion to suppress and motion for a mental examination and the appointment of a sanity commission. For the following reasons, we affirm Defendant's conviction.

## ANALYSIS

In his first assignment of error, Defendant argues the evidence was insufficient to convict him of second degree murder. Defendant maintains the only direct evidence of the circumstances surrounding an altercation between Defendant and the victim was Defendant's statement to police. He contends his statement supports only a verdict of manslaughter--that he killed the victim in the heat of

blood or sudden passion as a result of an intent formed during his struggle with the victim. La.R.S. 14:31.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

"Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir. 1983).

The statutory rule in evaluating the sufficiency of circumstantial evidence is, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. The Louisiana Supreme Court has explained the "hypothesis of innocence" stating:

> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or

2

compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Johnson*, 09-231, p. 6 (La.App. 3 Cir. 11/4/09), 21 So.3d 1159, 1164, *writ denied*, 09-2643 (La. 5/21/10), 36 So.3d 230 (quoting *State v. Chism*, 436 So.2d 464, 469 (La.1983)).

Defendant was convicted of second degree murder, defined in La.R.S. 14:30.1, which reads in pertinent part:

A. Second degree murder is the killing of a human being:

(1) When the offender has a specific intent to kill or to inflict great bodily harm . . . .

As noted by this court in *State v. Corley*, 97-235, p. 6 (La.App. 3 Cir. 10/8/97), 703 So.2d 653, 659, *writ denied*, 97-2845 (La. 3/13/98), 712 So.2d 875,

"Specific intent is the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." *State v. Carroll*, 95-859, p. 4 (La.App. 3 Cir. 1/31/96), 670 So.2d 286, 288. "Specific criminal intent is a state of mind and need not be proven as fact, but may be inferred from the circumstances present in the case and from the action of the defendant." *Id*. at 289. The severity of the attack on the victim is an indicator of the defendant's specific intent to kill. *State v. Myers*, 584 So.2d 242 (La.App. 5 Cir.), *writ denied*, 588 So.2d 105 (La.1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992); *State v. Segura*, 464 So.2d 1116 (La.App. 3 Cir.), *writ denied*, 468 So.2d 1203 (La.1985).

Manslaughter is defined in La.R.S. 14:31(A)(1), as:

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood

3

had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; . . . .

At trial, Lashandra Wright, who was a good friend of the victim's sister, Necomie Johnson, testified that on Friday, January 29, 2010, she tried to call the victim but did not get an answer. The following day, she received unusual text messages from the victim's phone number. Wright called the victim but never received any answer. Wright then called Necomie Johnson, and explained what had transpired. Johnson called Wright back and reported that when she tried to call the victim, she too, did not get an answer.

The following day, Saturday, January 30, 2010, Wright went to the victim's residence. When she knocked on the door, Defendant opened the door. She testified Defendant appeared nervous and was sweating profusely. When Wright asked if the victim was home, Defendant stated that the victim did not come home the previous night. When Wright pointed out that the victim's car was home, Defendant said he had dropped her off the day before with "some friends."

Wright spoke to the victim's sons, and they said they had not seen their mother. Wright told Defendant that she would take the boys with her, but Defendant said they would be alright staying with him. As Wright was walking back to her vehicle, Defendant called her to come back and speak to the victim's mother on the telephone. When he handed her the telephone, there was no one on the line.

Shortly thereafter, Necomie Johnson arrived. She entered the residence and began cursing at Defendant and asking him about the victim's whereabouts. Defendant repeated that he dropped the victim off with a friend the day before and had not spoken to her since that time.

4

According to Wright, the victim's residence was unusually dirty and things were strewn everywhere. Wright and Johnson went into the victim's room and saw three wet spots on the floor with baby powder sprinkled on top of them. Johnson confronted Defendant again. Defendant made a phone call and then left the residence, leaving behind the victim's boys. The victim's mother arrived, and the police were called.

Johnson testified she last saw the victim on Tuesday, January 26, 2010, when the victim came over to wash clothes. Johnson received a reply text message from the victim on Friday morning, January 29, 2010, which indicated she was in class. Later that day, before school was out, Johnson received another text message from the victim, asking Johnson to pick up her daughter at the bus stop. When Johnson got off work that evening, she called the victim's phone but did not get an answer. She also sent the victim a text but did not get a response. Later that same evening, Johnson received a call from the Defendant, telling her that the victim had not come home. He indicated they had not been having an argument and that he did not know why she had not come home. Johnson also recalled receiving a text from the victim's phone that made no sense and contained misspelled words, unlike a typical text message from the victim.

On Saturday, January 30, 2010, Johnson received a call from Wright, telling her that she needed to go to the victim's residence. Johnson met Wright outside the residence and was informed by Wright that Defendant and the victim's children were in the apartment. When Johnson knocked on the door, Defendant answered the door. She entered the residence and inquired about the victim. Defendant stated he did not know where the victim was and said she did not come home the

night before. Defendant indicated he last saw the victim when he dropped her off at school on Friday morning, January 29, 2010.

According to Johnson, the dining room table was covered with food, the chairs were dirty, and the children were running around. When she entered the victim's bedroom, there were no sheets on her bed, and wet spots were on the floor. Johnson noted a large stain on the floor with a pan and a bottle of barbecue sauce sitting next to the stain. When she walked into the room, she felt that the floor was wet. When Johnson asked Defendant about the sheets, he indicated that the victim had washed them. Johnson walked back to the front of the residence and observed that the television, the computer, and the children's games were missing. Defendant told Johnson the victim put the games in storage.

Eventually, Defendant left the residence and began running through the apartment complex. Johnson followed him by car to the front of the complex where Defendant's mother picked him up. Johnson asked Defendant to come back to the residence because she had called the police. Defendant refused and rode away with his mother, leaving the victim's children at the residence.

Corporal Ben Robinson with the Alexandria City Police testified that on Saturday, January 30, 2010, he received a report of a missing person and a disturbance at the victim's residence. While en route to the scene, he was waved down by a vehicle occupied by Defendant and his mother. Defendant reported there was a disturbance at the victim's residence, and he was trying to get away. Corporal Robinson instructed Defendant to go to the police department and wait for him.

Corporal Robinson first met with the victim's family members at the doorway of the residence. The victim's mother reported she had not heard from

the victim in a few days which, according to her mother, was highly unusual as they typically spoke several times a day. In the master bedroom, Corporal Robinson observed that the sheets were missing from the bed, and there were wet spots on the carpet with carpet freshener sprinkled on them. At the foot of the bed, a bottle of barbeque sauce was lying next to a large area of barbeque sauce that had spilled onto the carpet. The area was also sprinkled with carpet freshener. Corporal Robinson also noted a red smudge on a light switch in the hallway.

At this point, Corporal Robinson believed the residence was a possible crime scene and secured the residence. Detectives were called to the scene and arrived approximately thirty minutes later. Corporal Robinson stayed with the scene until he was released by a crime scene investigator.

Sergeant William Bates, a crime scene investigator with the Alexandria Police Department, testified he was dispatched to the victim's residence on January 30, 2010. He noted the scene had been secured prior to his arrival. Sergeant Bates photographed the crime scene, and the photographs were displayed for the jury. The photographs included the victim's car parked in front of the apartment, blood stains on bi-fold doors and a light switch located in the hallway, and three stains found on the carpeted floor in the master bedroom.

According to Sergeant Bates, all three stains were wet because they were darker than the remaining carpet. A stain located at the end of the bed had carpet freshener sprinkled around it. He also observed what appeared to be small white pieces of paper towel left behind after someone tried to wipe up a substance. A large stain also at the foot of the bed was wet around the edges, and a large amount of barbeque sauce had been poured within the stain. A barbeque sauce bottle was

7

near the stain along with a t-shirt used to rub the barbeque sauce into the carpet. Additionally, a pan containing a piece of meat was near the stain.

Sergeant Bates stated he could smell the odor of bleach emanating from the carpet stains. A bleach stain could be seen in a photograph of one of the stains. In the master bedroom, blood spatter was found on the bottom of the bi-fold doors of the closet, the bottom of the bedroom door, and at the top of the door frame. Sergeant Bates also found blood smears on a chest of drawers in the master bedroom that appeared to have been wiped with something. A drawer had been wiped down, leaving behind blood in the crack between the drawers. A piece of fabric had been cut from the mattress, and a piece of foam had been removed. A calendar was found in the master bedroom displaying the month of January with the days up to January 26th marked through with an "X" and January 27th marked through with a partial "X." Lastly, a wet stain was noted on the floor in the boys' bedroom. Once the carpet and padding were removed, Sergeant Bates observed that the concrete below was wet. Swabs of the wet stains were submitted to the North Louisiana Crime Lab for analysis and DNA testing.

Detective April Painter with the Alexandria Police Department testified that on January 30, 2010, she received a call from Corporal Robinson who advised her of the possible crime scene. She proceeded to the police department where she talked to Defendant, who willingly gave a statement. Defendant was not a suspect, nor was he detained or in custody at that time. The recorded statement began at 7:25 p.m. and lasted about twenty minutes.

The recorded statement was played for the jury, and a transcribed copy of the statement was provided to each juror. When Detective Painter asked Defendant if he had called the Alexandria Police Department to report the victim

8

missing, he explained that he first went to the residence of a sheriff who lived nearby and the sheriff gave him "the 411 number" to call and report the missing victim. According to Defendant, the victim had driven her car to school at 7:45 a.m. and returned home around 10:30 to 10:45 a.m. He last saw the victim when he brought her back to school around 11:30 to 11:45 a.m. Defendant did not pick the victim up after class because she was going out with her friends. The last time Defendant spoke with the victim was when she called around 2:15 to 2:30 p.m. to remind him to pick up her three children at the bus stop. Defendant did not ask the victim what she was doing because she would get mad if he asked a lot of questions.

Defendant also stated he had not tried to call the victim since he had last spoken to her. When asked why he had not tried to call her, Defendant stated:

> A: Cause I know if she ain't go answer the phone, she ain't go answer it. Ain't no use in my calling fifty times. Cause I rem—it was like uh. . . I don't know but the school remember me calling up there cause I called the phone, cause everybody was telling her, phone call. And she—if she ain't go answer the phone, she ain't go answer the phone, cause I called her like twenty times when she was in class. And I call the lady up there and they told me that she was in class, take a message.

Detective Painter asked Defendant again if he had called and checked on the victim after her last call to him. Defendant replied:

> A: I mean she usually comes back. When she's out, she's out. I don't just call her and bug her like that.

The victim did not take any clothes with her, and Defendant last saw her wearing blue scrubs.

Next, Defendant stated that he spoke with the victim's family members and a friend after they arrived at her residence that day. According to Defendant, Lashandra Wright was the first to arrive after 3:00 p.m., and then Necomie

9

Johnson, the victim's sister, arrived. The victim's mother arrived around 6:00 p.m. When asked if he had fought with the victim on Friday, the Defendant replied, "No." According to Defendant, the victim was going to a tattoo shop on Monday to get his name tattooed on her arm. The victim took care of him because he did not have a job. He intended to join the military but had failed the test by one point. He planned to take the test again and was going to marry the victim after he finished basic training.

Lastly, Defendant testified that the victim had never stayed away overnight. He did not call to see if she had gone to work, because she had not come home to get her work identification. Defendant admitted to arguing with the victim earlier in the week about her "baby daddy." He maintained, however, that they did not get into an altercation.

According to Detective Painter, Defendant appeared nervous throughout the interview. She also observed several scratches or marks on Defendant's face, marks on his hands, and a long cut on his finger that looked "fresh" to Detective Painter. The marks on his face appeared to be fingernail marks. Defendant was then *Mirandized*, and questioned about each mark. He was not under arrest or detained at that time. Photographs of the wounds were taken by Detective Klein Johnson and were shown to the jury.

After the photographs were taken, the Defendant gave a second statement which began at 8:32 p.m. and lasted four minutes. The recorded statement was played for the jury, and a transcribed copy of the statement was provided to each juror. Defendant maintained that a long mark on his hand occurred on the night after he dropped the victim off at work. According to Defendant, he helped a neighbor named Daniel change the alternator in his green Honda Civic. Defendant

10

did not know Daniel's last name but recalled that he lived in apartment number 1506. Also, Defendant stated that one of the marks occurred the previous evening when he cut himself with a knife.

With regard to the three marks on his face, Defendant stated they occurred three to four days prior to his interview when he and the victim were playing. Defendant explained that they were wrestling—he picked her up and tickled her feet. According to him, the victim would do anything to make him stop or to "get free." Detective Painter also inquired about marks on Defendant's chest located above the right breast:

> Q  These marks right here, do you know where that would be from, that's over your uh right breast?
>
> A  No ma'am.
>
> Q  You don't know where those marks come from
>
> A  (Inaudible).
>
> Q  It appears to be a scratch, you don't . . . . .
>
> A  I mean I be scratching.

Defendant was released after his statement.

Detective Painter proceeded to the victim's residence and took statements from her family members. After contacting the victim's school, Blue Cliff College, and learning that the victim was not in class on Friday, Detective Painter knew Defendant's assertion that he last saw the victim on Friday, January 29, 2010, when dropping her off at school was likely untrue. The trial testimony of April Johnson, an extern supervisor with Blue Cliff College, confirmed that the victim was absent on Friday, January 29, 2010. According to Ms. Johnson, the victim attended her classes at 8:00 a.m. and 10:00 a.m. on Thursday, January 28,

11

2010, but was absent from her 12:00 p.m. class and had no contact with the school after that day.

On Sunday, January 31, 2010, Detective Painter contacted Defendant and asked him to return to the police station for additional questioning. Detective Painter, Sergeant Howard, and Sergeant Green participated in the interview. Defendant was not under arrest or detained at that time. Defendant was *Mirandized* and signed a waiver of rights form at 4:57 p.m. A formal statement was not taken at that time. According to Detective Painter, Defendant appeared nervous and was drinking a lot of water. The officers asked Defendant repeatedly about the victim's whereabouts. At approximately 8:00 p.m., Detective Painter decided to obtain a warrant for obstruction of justice because they felt Defendant had altered the crime scene.

Prior to his arrest, Defendant wrote the word "third" on a piece of paper. Detective Painter and Sergeant Green both asked the Defendant what that meant. Around 11:00 p.m., Defendant stated that he had put the victim in a green dumpster located in the parking lot of a store on Third Street. Defendant explained that on Thursday, January 28, 2010, the victim had gone to school that morning and when she returned home during her break, he found a phone number on a piece of paper and two condoms in her vehicle. He stayed outside a few minutes, contemplating how he would inquire about the phone number and condoms. When he went inside and asked the victim about it, Defendant stated she became very upset and went after him with a kitchen knife, cutting his finger.

The victim followed Defendant as he ran to the master bedroom. He picked up a hammer and hit her in the head. She continued to pursue him and he hit her again. Defendant estimated that he hit the victim three times before the hammer

12

broke.  Defendant then picked up a clothing iron and started hitting the victim in the head with the iron.  Despite this, the victim continued calling Defendant names and threatening him.  Defendant said he lost his temper and wrapped the cord of the iron around the victim's neck and began choking her.  When she lost consciousness, he picked her up and took her to the boys' room.  He saw that she was bleeding and tried to arouse her but she did not respond.

Before the victim's children returned from school, Defendant put the victim in bed.  When the children got off the school bus, they entered the residence and went about their daily routines.  According to Defendant, the children did not ask about their mother.  Defendant then brought the victim's daughter to her grandmother's house, and the boys stayed with him while the victim remained in bed.

Around 12:30 a.m. on Saturday, January 30, 2010, while the boys were in their bedroom, Defendant dragged the body through the house and to the patio where he tried again to arouse her.  He then put her body in the backseat of her vehicle and went riding for a bit.  He then decided to put the body in the dumpster.  Police subsequently found the victim's body in the dumpster.

A formal, recorded statement was taken from the Defendant around 12:30 a.m., February 1, 2010, and ended at 12:50 a.m.  The recorded statement was played for the jury, and a copy of the transcribed statement was given to each juror.  Defendant's statement paralleled Detective Painter's trial testimony.  Defendant stated that the victim was in a dumpster on Third Street in a parking lot near Joe's Store.  When asked if the victim was still living, he replied, "Probably no."

Dr. Joel Carney, a forensic pathologist, testified that he performed the victim's autopsy.  When her body was removed from the dumpster, her hands were

tied behind her back, her left leg was tied to her hands, and a bungee cord was around her right ankles. The victim's head was wrapped in several layers of plastic bags tied around her neck, and a strong smell of bleach emanated from her body. The victim sustained multiple injuries leading to her death, including multiple stab wounds, multiple incised wounds, blunt force trauma, various contusions and hemorrhages, and neck compression. Her death was officially classified as a homicide.

Dr. Jessica Esparza, a forensic DNA analyst at the North Louisiana Crime Lab, testified that she tested the evidence submitted for suspected blood. Blood found on the hallway closet door, a drawer in the master bedroom, the back of a hooded sweatshirt the Defendant was wearing on the day of his arrest, the bottom of a carpet sample, and carpet padding was consistent with the DNA profile obtained from the victim. From the evidence submitted, Dr. Esparza did not find blood belonging to anyone other than the victim.

Corporal Klein Johnson with the Crime Scene Unit of the Alexandria Police Department testified that he participated in processing the evidence recovered from the residence and dumpster, and he photographed both scenes. From the dumpster, Corporal Johnson removed a trash bag containing the victim's purse and three to four bags filled with bloody bed linens and towels. The victim's leg was then revealed and upon the removal of a blue plastic tote, the remainder of her body was exposed. The victim's head was bound in plastic bags. Also, an iron cord was tied around her neck, her hands and feet were bound with electrical cords, and bungee cords connected her hands to her legs. After the victim's body was removed from the dumpster, Corporal Johnson began to open the plastic bags one at a time to expose her face and photograph the injuries.

After the coroner's office picked up the victim's body, Corporal Johnson continued to collect evidence from the dumpster. Bags recovered from the dumpster were taken back to headquarters. In the bottom of one of the bags were a hammer handle, a white metal hoop earring, and the handle of a black knife with no blade. The head of a hammer was recovered from the bottom of the dumpster.

After obtaining a search warrant, Corporal Johnson returned to the victim's residence to collect additional evidence. A lid to a blue plastic tote, the approximate size and shape of the tote recovered from the dumpster, was recovered from under the bed in the master bedroom. A white metal hoop earring, consistent in size and shape with the earring found in the dumpster, was found on the mattress in the master bedroom.

Considering the evidence presented at trial, any rational trier of fact could have found the essential elements of second degree murder proven beyond a reasonable doubt. Although Defendant is correct that his statement was the only direct evidence regarding an altercation with the victim that led to her demise, the record is replete with circumstantial evidence upon which the jury could reasonably infer guilt to support a conviction for second degree murder. Further, a rational juror could have concluded that Defendant had the specific intent to kill the victim based on the severity of the injuries that resulted in the victim's death. *See State v. Runyon*, 05-36 (La.App. 3 Cir. 11/2/05), 916 So.2d 407, *writs denied*, 06-1348 (La. 9/1/06), 936 So.2d 207; 06-667 (La.App. 3 Cir. 11/17/06), 942 So.2d 526. Lastly, the weight of the circumstantial evidence far exceeds the weight of Defendant's self-serving testimony, the only evidence to suggest he may have committed the offense in the heat of blood or sudden passion. Accordingly, this assignment of error is without merit.

We also note Defendant set forth two additional assignments of error and reserved his right to file a supplemental brief to address these errors once the record was supplemented with the necessary transcript. The supplemental record was received by this court, but Defendant did not file a supplemental brief discussing the merits of these alleged errors. Accordingly these assignments of error must be considered abandoned as they are not addressed. Uniform Rules—Courts of Appeal, Rule 2-12.4

## DECREE

For the foregoing reasons, Defendant's conviction on the charge of second degree murder is affirmed.

**AFFIRMED.**